Robert L. HOLLAND, Plaintiff,

v.

FIRST VIRGINIA BANKS, INC., et
al., Defendants.

Civ. A. No. 90–64–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 20, 1990.

Victor M. Glasberg, Victor M. Glasberg
& Associates, Alexandria, Va., for plaintiff.

Kathleen T. Barlow, Falls Church, Va.,
Gerald S. Hartman, Gregory W. Homer,
Anderson Kill Olick & Oshinsky, Washington, D.C., for defendants.

MEMORANDUM OPINION

BRYAN, Chief Judge.

This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[1] Testimony in the case was adduced on July 10 and 11, 1990.

*Findings of Fact*

1. The plaintiff is a 46 year old black male who went to work for the defendant, First Virginia Banks, Inc., on September 18, 1988. He had previously served in the United States Army from July, 1967 until January, 1988. He worked for First Virginia was as a maintenance employee and his immediate supervisor was the defendant, Donald Brennan, who is responsible for the maintenance of all the bank's approximately twenty-one facilities in this area. Although he is not an officer of the bank, Brennan had the power to hire and fire maintenance employees, including the plaintiff.

2. The plaintiff performed his duties in a satisfactory manner for the bank. He received good performance evaluations and a 7% raise during his period of employment.

3. The plaintiff was the first black employee in the particular maintenance section where he worked, although there were other black employees in other facilities supervised by Brennan. The plaintiff was in the same office with Brennan and Brennan supervised his day-to-day operation. When the plaintiff first went to work in Brennan's office, he was told by a fellow-employee he should be careful since he was the first black employee in the office.

4. Within approximately forty-five days after the plaintiff began his employment, Brennan began to refer to the plaintiff as "Chicken Little," "Chicken George," "Sparerib Kid," "Watermelon Man," or "Watermelon Kid." He referred to the plaintiff as "Boy," or "his Boy." In some instances the plaintiff was referred to in these terms by other employees in the presence of Brennan. Brennan also told the plaintiff in the presence of some of his fellow-employees that he had seen a dead 'coon in the road and suggested that the plaintiff take it home and make stew for his family. In another instance, when there were donuts in the office, Brennan told the plaintiff that he couldn't have them because they had not been fried in chicken fat or chicken grease. A sign entitled "Chicken Little," or "Love that Chicken," was placed on the plaintiff's "IN" box in the office. The plaintiff complained to Ambrosie, a vice-president of the company, that this was offensive to him, but nothing was done by Ambrosie to see to its removal. The sign stayed up approximately three weeks.

5. The plaintiff's fellow-employees, as well as the the plaintiff, interpreted this name-calling as evidencing stereotyped concepts of the eating habits of black people.

6. This conduct on behalf of Brennan was demeaning and humiliating to the plaintiff. He felt he was being put down as an individual and as a black man. He deferred, however, making an immediate complaint concerning the conduct because he had been counselled while still in the military that as a recent convert from military to civilian life, there were changes he would have to accept and he felt perhaps this was a "hazing" of a new employee which would cease. It did not.

7. In March of 1989, the plaintiff decided to do something about the situation and he told Brennan that he was "fed up." Brennan replied that the plaintiff was too sensitive; he laughed it off; and he stated that "sticks and stones will break my bones, but words will never hurt me," or words to that effect. The name calling continued after the plaintiff's complaint to Brennan, and continued until June of 1989

1. The complaint also sought recovery pursuant to 42 U.S.C. § 1981 and a state law claim for intentional infliction of emotional distress. These claims were tried to a jury at the same time the court heard the Title VII aspect of the complaint. The jury found in favor of the defendant on the intentional infliction of emotional distress claim and in favor of the plaintiff on the § 1981 claim. The jury awarded the plaintiff on that claim $20,000 in compensatory damages against both defendants, $1,000 in punitive damages against the defendant Brennan, and $500,000 in punitive damages against the defendant First Virginia Banks, Inc.

when the plaintiff went to see Beavers, a senior vice-president of the defendant. To Beavers he complained of the racially oriented name calling and various other matters concerning his work assignment and sick leave. This first meeting occurred while Brennan had already left on a three or four day trip, and Beavers promised to fully investigate the plaintiff's complaints when he, Beavers, returned from a trip he also was planning.

8. Upon Beavers return, he discussed the matter with Brennan. Brennan admitted calling the plaintiff Chicken Little and Watermelon Man; however, he contended that it was only kidding. Beavers instructed Brennan that the name calling and kidding should cease. Brennan was upset when told that the plaintiff had complained to Beavers.

9. At a meeting on June 28, 1989, attended by the plaintiff, Beavers, Cook, Brennan and Wilson, all parties felt the matter had been resolved and the plaintiff proffered his satisfaction with the resolution of the matter. At or about this time the plaintiff's fellow-employee, Tolly, who had suggested to the plaintiff that the plaintiff complain to Beavers, was fired. Another fellow-employee, Ceeba, told the plaintiff his days were numbered at the bank and that Brennan would not forgive him for going over his head to Beavers. The plaintiff became "scared" and submitted an application to Marriott for part-time work. He advised Brennan of this on July 10. He never obtained employment for full or part-time work since there was no job available with Marriott for 8–10 months because of lack of funding.

10. On July 20, 1989, the plaintiff was injured on the job and on July 25, 1989, Brennan called the plaintiff at home and told him they had accepted his resignation. The plaintiff denied that he had ever resigned and Brennan said he would send the plaintiff a letter concerning this. That letter (PX–17) shocked and surprised the plaintiff, and he responded in a letter (PX–18) expressing this shock and surprise, denying that he had resigned, and, in effect, asked for his job back.

11. The court rejects the defendant's assertion that the plaintiff resigned on July 10, 1989. Both Cook, who was also one of the plaintiff's supervisors, and Beavers were told *by Brennan* that the plaintiff had resigned. Beavers was surprised.

12. The court also rejects the assertions that the name calling was only meant in fun, and that no intimidation or racial harassment of the plaintiff was intended, and that the references to chicken were motivated by the plaintiff's obsessive appetite for chicken. The very making of the argument that such remarks can be considered "fun" or "joking" is the same mindset that finds it acceptable, as Brennan testified, to call his fellow-employee Schlandensky a Pollack, and to argue that because the plaintiff allegedly referred to himself on several occasions as a "nigger," this somehow makes benign the application of names to him which are racial stereotypes. The insensitivity that prompts such assertions has helped prove the plaintiff's case.

The defendants are not entirely guileless, moreover. Their first reaction was to deny that the name-calling occurred (See Ans. to Interrogatories Nos. 5 and 10). When it became apparent that such a denial was spurious, they resorted to a belittlement of the claim by characterizing the conduct as the type of kidding and joking that normally goes on in the work-place; not to be taken seriously; and a suggestion that the brunt of the name-calling was being overly sensitive. The defendants have still, to this day, not acknowledged or apparently even recognized, the humiliation that such conduct inflicts.

13. The court finds that the name-calling constituted racial harassment; that the plaintiff's termination and the defendant's refusal to re-hire him were in retaliation for the plaintiff's complaints to Beavers concerning the racial harassment by Brennan; and that this conduct constitutes discrimination on account of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

### Liability of Brennan

The defendants assert because Brennan was not a named respondent in the plaintiff's E.E.O.C. complaint he must be dismissed from the plaintiff's Title VII claim. Defendant relies on *Dickey v. Greene*, 710 F.2d 1003 (4th Cir.1983). The decision in that case was vacated and is not binding precedent. *Dickey v. Greene*, 729 F.2d 957 (4th Cir.1984). Moreover, the court finds that the E.E.O.C. complaint, as amended, clearly put both defendants on notice of the plaintiff's claim against Brennan.

### Statute of Limitations

Defendants claim that the failure of the plaintiff to file his claim with the E.E.O.C. within 180 days of the alleged unlawful employment practice as required by 42 U.S.C. § 2000e–5(e) bars his claim. Virginia, however, is a so-called "deferral state," and consequently the plaintiff had a 300 day filing period. *E.E.O.C. v. Hansa Products, Inc.*, 844 F.2d 191 (4th Cir.1988). Plaintiff's Title VII claim is accordingly not time barred.

### Relief

During trial the plaintiff withdrew any claim for back wages or reinstatement, requesting only declaratory relief and nominal damages insofar as his Title VII claim was concerned. The court finds that such declaratory relief is appropriate, as are nominal damages. The declaration should act as a deterrent. The court will, therefore, enter an order declaring that the plaintiff's rights under Title VII have been violated by the racial harassment on the job and by a termination and failure to re-hire in retaliation for his complaints of racial harassment on the job. Nominal damages in the amount of $100.00 will be awarded together with costs, including attorney's fees.